**ANHEUSER–BUSCH, INC., Appellant,**

v.

**JEFFERSON DISTRIBUTING COM-
PANY, Inc., Appellee.**

**JEFFERSON DISTRIBUTING COM-
PANY, Inc., Appellant,**

v.

**ANHEUSER–BUSCH, INC., Appellee.**

**No. 21879.**

United States Court of Appeals
Fifth Circuit.

Dec. 6, 1965.

Drayton T. Scott, L. Vastine Stabler, Jr., Birmingham, Ala., Dwight D. Ingamells, Stuart F. Meyer, St. Louis, Mo., Cabaniss, Johnston, Gardner & Clark, Birmingham, Ala., of counsel, for appellant.

D. H. Markstein, Jr., Birmingham, Ala., for appellee.

Before TUTTLE, Chief Judge, and RIVES and GEWIN, Circuit Judges.

TUTTLE, Chief Judge:

Anheuser-Busch, Inc., the Defendant in the action in the trial court, here appeals from a judgment for damages against it for an alleged breach of contract of distributorship of one of its brands of beer. The Jefferson Distributing Company, Inc., the Plaintiff below, appeals from an order of the trial court dismissing a count of the same complaint, seeking damages for a breach of the alleged terms of a distributorship contract dealing with a different brand of beer.

We deal first with the appeal from the judgment for damages, based upon the contention made in the first count of the complaint, that Jefferson Distributing Company had been damaged by an illegal termination of a distributorship for Busch Bavarian Beer by Anheuser.

The basic facts, necessary for a decision of the appeal, are: Commencing in 1937 and continuously through July 31, 1963, Jefferson acted as a distributor in Jefferson County, Alabama, of beer manufactured by Anheuser under the name of Budweiser. Repeatedly, during the period of time in question, there was correspondence between Anheuser and Jefferson, directed either expressly to the single purpose of defining the relationship between the parties or containing a clause or paragraph reiterating the nature of the relationship. The letter of February 9, 1948 is illustrative. That letter, sent out from Anheuser-Busch "To Our Wholesalers" was mailed in duplicate and the original copy was acknowledged by D. S. Meyer, the then president of Jefferson Distributing Company. The letter contained the following language:

"As you know, the fundamental principle governing our relations with you, and every wholesaler of our beers, is that Anheuser-Busch, Inc., has no separate sales corporation, does not create selling franchises nor enter into any form of continuing sales contracts. Our sales are and have always been on an order-to-order basis, f. o. b. St. Louis, Missouri, each order requiring approval at our home office in St. Louis, including approval by our Credit Department. The relationship being simply that of seller and purchaser, *it carries with it the freedom to terminate the relationship either by you or by us at any time.*

You also know that the authority to enter into, alter or terminate any such relationship on behalf of Anheuser-Busch, Inc., is vested solely in the Sales Manager, Brewery Division, of our company.

\* \* \* \* \* \*

"So that we will know you fully understand what has been said above, please immediately fill in the information requested below and return this letter to me. The extra copy is for your file." (Emphasis supplied)

Then, at the bottom of the letter, as was true on the letterhead used on correspondence sent out from the home office of Anheuser-Busch, Inc., there appeared the following legend, "All beer and beverages sold on order-to-order basis. No contracts, agencies or franchises awarded."

On November 29, 1948, Anheuser sent another bulletin "To Our Wholesalers." This also went out in duplicate over the signature of the vice-president and sales manager. The original was again acknowledged by Mr. Meyer as president of Jefferson Distributing Company and returned to Anheuser with Meyer's signature appended. This bulletin was in the nature of general criticism of certain procedures followed, or that were not being followed, by wholesalers. It laid down certain specific requirements of record-keeping and the like, and stated that the recommended system was a primary responsibility of each of the wholesalers to put into effect. It concluded "To help you, we will provide the sales record cards on request. But whether you use ours or your own, you are expected to have your system set up and in full operation not later than February 1, 1949." The bulletin then ended with the following language:

"This is both a caution and a warning. As you know our relationship is on an order-to-order basis. The relationship being simply that of seller and purchaser, it carries with it *the freedom to terminate the relationship either by you or by us at any time.*

If you fail to properly protect the position of Budweiser in your territory by fully complying with our policies—as you will do in this instance UNLESS YOU FOLLOW THESE INSTRUCTIONS, on setting up and maintaining an adequate sales record card system—I will have no alternative except to protect the best interests of Anheuser-Busch, Inc.

Because what this bulletin contains is so important to our company and so vital to your future as a Budweiser wholesaler, I want to make certain that it comes to the direct attention of each wholesaler. To be sure there is no misunderstanding of the contents of this bulletin, I am asking the wholesaler himself—or a partner or an officer of his firm—to sign below, fill in the title, firm name, city, state, and date, and PROMPTLY RETURN ONE COPY of this bulletin to me. The other copy is for your file." (Emphasis and capitals in the original.)

Again, the letterhead on which this bulletin was issued, carried the legend "All beer and beverages sold on order-to-order basis. No contracts, agencies or franchises awarded."

Other letters were in evidence, typically those of May 22, 1958 and March 1, 1961, reiterating the same formulation of relationship as has been described in the letters quoted from above. Those dated after 1956 or 1957 were received and signed by Louis Davis, who had latterly become president of Jefferson Distributing Company.

In addition to the foregoing, every confirmation of an order from Jefferson Distributing Company carried the legend under the heading "Confirmation." "The prices and terms of sale of this order shall be determined as of the date of shipment. Anheuser-Busch, Inc., reserves the right to reschedule this order if it is found necessary because of production considerations or other unusual causes." "¶ All beer and beverages are sold on an order-to-order basis, no contracts, agencies or franchises awarded." The testimony is that several hundred of these confirmations were sent by Anheuser-Busch during the course of dealings between the companies.

In June, 1962, Jefferson commenced for the first time distributing Busch Bavarian Beer, manufactured by Anheuser, in the same territory. The commencement of this distribution followed negotiations between the parties commencing as far back as 1958. There were discussions in Tampa, Florida in March, 1962, and again in April in Birmingham. On the latter date there was held what was called a "Gear up" meeting. Davis, President of Jefferson, testified that at the Tampa meeting August Busch, III, Vice-President of the company said, "I am going to give you Busch." Mr. Davis testified: "That is what he said. I said, 'Mr. Busch, I will try to do the best job I know how but in case I don't, I will come back to you and tell you you can have it back'". Mr. Davis also testified that at the April 24th meeting he told "the Anheuser-Busch people" he didn't think he could break even. In response to a question asked by the court, "What did they say to you about that?" Mr. Davis replied, "Well, they told me that 'you got plenty of time and you got to spend a little money for advertising and you may lose some money to start off, but eventually within due time, or within a few years you may come back up'." He also testified that one of the Anheuser people, but he did not remember which, told him that he would be entitled to a certain mark-up, but that six weeks after he started selling Busch Bavarian Beer, the mark-up was reduced by the company. Jefferson continued to buy at the higher price.

A little over a year later, on the 24th or 25th of July, 1963, a representative of Anheuser told Davis they were going to cancel the account as of August 1st.

Between the March meeting in Tampa and the April 24th meeting in Birmingham, Jefferson Distributing Company, Inc., over the signature of Louis Davis, wrote Anheuser informing the latter of a change in ownership of stock in the corporation. This letter ends with the statement, "We acknowledge that this corporation holds no franchise from Anheuser-Busch, Inc., and that as a wholesaler, our relationship is on an order-to-order basis, terminable at will by either the wholesaler or the brewery." This letter was acknowledged by the company by certified mail, return receipt requested, in which Anheuser-Busch stat-

ed that the matter of stock ownership was solely for the stockholders and Jefferson Distributing Company, Inc., and "does not in any way involve Anheuser-Busch, Inc." This letter again ended with the following paragraph: "We wish to again call your attention to the fact that all of our sales to Jefferson Distributing Company, Inc., are on an order-to-order basis, and no contracts, agencies or franchises are awarded."

Then, on May 1, 1962, still before the first sale of Busch Bavarian was made to Jefferson, a form letter, personally addressed and sent out by certified mail, was sent to Jefferson Distributing Company in duplicate; the original was acknowledged and signed by Davis and returned to Anheuser-Busch. This letter, on its face, had no purpose other than to contain the message which is again quoted here: "Our sales are and have always been on an order-to-order bases f. o. b. brewery, each order requiring approval at our home office in St. Louis, including approval by our Credit Department. The relationship being simply that of seller and purchaser, it carries with it the freedom to terminate the relationship either by you or by us at any time, and if either party terminates the relationship, Anheuser-Busch, Inc., or its newly-designated wholesalers will have the right to purchase all inventory of the terminated wholesaler at the original cost of acquisition. ¶ For your further information, the authority to enter into, alter, or terminate any such relationship on behalf of Anheuser-Busch, Inc., is vested solely in the vice-president-marketing of our company." As stated, the original of this was signed by Mr. Bien, vice-president-marketing and acknowledged by Jefferson Distributing Company, signed by Louis Davis, president.

Mr. Davis testified that at the April meeting, the company discussed many requirements that must be met by Jefferson, including the specific number of salesmen and routemen, the number of trucks that would be needed, the kind of warehousing space, and the fact that the two brands of beer would have to be marketed separately. Also, it was Mr. Davis' testimony he was told that he would have to do some local advertising. He said Jefferson was required to lease six trucks on a six year lease. If revelant, this testimony was sufficient to warrant the inference that no sales of Busch Bavarian would be made to Jefferson unless these requirements were met.

Evidence was submitted as to damages, in the nature of an auditor's report showing that proceeds from sales of Busch Bavarian Beer for the period in question produced less gross receipts than the costs to Jefferson Distributing Company, and this deficiency amounted to something like $62,000. The trial court, in charging the jury stated that the businesses of Jefferson Distributing Company in its sales of Budweiser and its sales of Busch Bavarian could not be separated. There was no proof as to the profit or loss of Jefferson Distributing Company for the period ending July 31, 1963, the date of the cancellation of the contract although there was proof that for the calendar year ending December 31, 1962, the total operation of the company showed a net profit of some $29,000.

The appellant, Anheuser-Busch, Inc., moved for a directed verdict on the ground that the relationship between the parties was in writing, and it was simply that of manufacturer and wholesaler resulting in a sales agreement to Jefferson, terminable at will by either party. The trial court denied the motion for directed verdict and submitted the case to the jury, permitting it to decide what was the actual contract between the parties; whether there was a breach of the contract; and whether damages for such breach had been proved.

The trial court, in its charge, stated to the jury that it could find that the relationship between the parties partook of any one of three types: (1) that there was a contract, binding on Anheuser, that Jefferson "would be permitted to continue as exclusive distributor of Busch Bavarian as long as [it] did a good job or at least until [it] had recovered the

losses sustained in connection with the introduction of that beer;" (2) that this was strictly and solely a relationship of manufacturer and wholesaler, terminable at will without any obligation to continue for any purpose; (3) here we quote the court's charge: "But suppose you decide that in reality the relationship is neither that wholly of buyer and seller, as the defendant contends, or that of exclusive distributor as long as the plaintiff did a good job, or at least until it recouped its losses, then you would say, 'Well, there was some relationship, what was it?' In view of the background facts in the case and in view of the course of conduct of the parties and in view of their statements, was the relationship more than that of buyer and seller, or did it partake of the nature of the relationship between a maker and a distributor or a principal and agent?

If you are reasonably satisfied that the relationship was more than that of merely buyer and seller acting at arm's length, then that relationship would involve a relation of mutual confidence, trust and diligence."

The jury found a general verdict for $30,000 in favor of the plaintiff. It is, thus, impossible to tell whether the jury found the relationship between the parties to have been the one discussed above as (1) or (3). It is clear they did not find that the relationship was that claimed by Anheuser-Busch, Inc.

It is quickly apparent to anyone reading this record that if a manufacturer ever sought to prevent any relationship from arising that obligated it to do more than hold itself out as ready to receive offers of purchase from an established dealer, then this defendant did. At first glance, it would appear that the only reason a distributor could justify a contention that the relationship had more permanence than from order-to-order would be that the company's repetition of this formula was so steady and monotonous as to lull it to sleep. Both before, during and after negotiations were under way for the purchase by Jefferson Distributing Company of the Busch Bavarian product, its officials were repeatedly acknowledging that the relationship was on "an order-to-order" basis and that no franchises or contracts or agencies were established.

■ By commenting on the fact that the letterhead and the order acknowledgment slips used by Anheuser carried the legend, "All beer and beverages sold on order-to-order basis. No contracts, agencies or franchises awarded," we do not mean to suggest that this fact, if it stood alone, would as a matter of law foreclose the right of a court to inquire whether the parties really intended for this printed matter to control, if there had been substantial oral negotiations and discussions dealing with the matter. This would be a question for the jury to decide. Des Moines Blue Ribbon Distributors, Inc. v. Drewry's Limited, 129 N.W.2d 731 (Supreme Court of Iowa, 1964) cf. Millett Company v. Park and Tilford Distillers Corporation, 123 F. Supp. 484 (N.D.Cal., 1954). We comment on the presence of this legend, however, only because it was universally used and is fully corroborative of all of the other writings between the parties dealing with the relationship.

Time and again, Anheuser and Jefferson, in the body of their correspondence, explicitly stated their understanding of the relationship between the two corporations. As late as April 12, 1962, Davis, who was President of Jefferson, wrote to Anheuser about a sale of stock, saying, "We acknowledge that this corporation holds no franchise from Anheuser-Busch, Inc., and that as wholesaler our relationship is on an order-to-order basis, terminable at will by either the wholesaler or the brewery." Subsequent to the meetings at which Jefferson claimed the oral modifications of its agreement with Anheuser-Busch took place, Bien, the Vice-President of Anheuser, wrote to Jefferson. He explained that his May 1st letter was "a restatement of certain fundamental principles governing our relations" with Jefferson. The letter reiterates that sales are on an order-to-order basis" and that the "relationship

[between Anheuser and Jefferson] being simply that of seller and purchaser, it carries with it the freedom to terminate the relationship either by you or by us at any time * * *." Davis acknowledged this May 1, 1962 letter on May 30, 1962.

■ Everything offered by way of oral testimony on behalf of the plaintiff on which it seeks to build its claim, is in derogation of the writings that were entered into by the letter of May 1st, acknowledged on May 30th. The courts of Alabama recognize the basic principle long known as the parol evidence rule to the extent that parol evidence is not permitted "to explain, contradict, vary, add to, or subtract from" the terms of a written contract between the parties. Lightsey v. First National Bank, 273 Ala. 416, 142 So.2d 681 (citing and relying upon Hartford Fire Insurance Company v. Shapiro, 270 Ala. 149, 117 So.2d 348) which says, "[A] plea is bad which sets up a statement of facts of a contemporaneous verbal agreement which is repugnant to and contradictory to the terms of the written instrument declared upon and the express intention of the parties therein contained," (citing also Steiner Bros. v. Sliffkin, 237 Ala. 226, 186 So. 156).

■■ We do not have here the question of whether the oral evidence was admissible to prove a subsequent oral agreement altering a writing (cf. Young v. United States, 327 F.2d 933, 5 Cir., 1964), and authorities there collected. Here, all of the oral evidence sought to be relied upon by the plaintiff occurred prior to the written agreement of May 1st and thus was merged into the written agreement. The fact that the May correspondence was merely the last of a series of similar letters in which both parties repeatedly stated that the relationship was solely that of purchaser and seller warrants the observation that invoking the parol evidence rule in such a case appears to us to be much more than the invoking of a technical rule of evidence; it appears, rather, to require the court to recognize the existence of a relationship which both parties consistently maintained was the true relationship between them.

■ Turning now to the appeal by Jefferson, based upon the order of the trial court dismissing the second count of the complaint, we affirm the order of the trial court. This count charged that during the continuance of the Anheuser-Busch contract, and prior to the transaction dealing with Busch Bavarian, Jefferson had the same relationship with Anheuser that has already been outlined above. The relationship was not even sought to be changed by the allegation of oral terms. It was charged that during the existence of this distributorship, Anheuser required Jefferson to sell Anheuser products in a manner that in some respects violated the state laws in Alabama, including the sale of certain products at less than state established prices.

The trial court, holding that the affidavits before it clearly indicated that there was nothing but an arrangement between the parties providing for an order-by-order relationship, there could be no coercion of the nature complained of because the alternative was for Jefferson to stop purchasing the products. The court held that "Plaintiff, being free to buy or not to buy Budweiser, and the defendant being free to sell or not to sell Budweiser, the court is of the opinion that a threat of the defendant not to sell Budweiser unless plaintiff engages in certain activities and plaintiff's subsequent engagement in such activities to its detriment, cannot constitute a cause of action against defendant." This is clearly right.

The judgment on the jury verdict is reversed, and the judgment of dismissal as to the second cause of action is affirmed. The case is remanded to the trial court for the entry of judgments not inconsistent with this opinion.